**UNITED STATES of America**

v.

**Charles E. WIGGINS, Appellant.**

**No. 73–1367.**

United States Court of Appeals,
District of Columbia Circuit.

Argued March 11, 1974.

Decided Jan. 2, 1975.

Jerry D. Anker, Washington, D. C. (appointed by this Court), with whom Robert M. Lichtman, Washington, D. C., was on the brief, for appellant.

Steven R. Schaars, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty. at the time the brief was filed, and John A. Terry, Asst. U. S. Atty., were on the brief for appellee. Earl J. Silbert, U. S. Atty., also entered an appearance for appellee.

Before HASTIE,* Senior Circuit Judge for the Third Circuit, and ROBB and WILKEY, Circuit Judges.

ROBB, Circuit Judge:

A jury in the District Court convicted the appellant Wiggins of murder in the first degree, 22 D.C.Code § 2401, and of carrying a dangerous weapon, 22 D.C. Code § 3204. He was sentenced to concurrent prison terms of twenty years to life for first degree murder and not more than one year for carrying a dangerous weapon, these sentences to be served concurrently with any other sentences then being served.[1] On this appeal Wiggins contends that (1) various statements and a confession he made to a police officer were wrongly received in evidence; (2) the District Court erred by receiving in evidence a part of the confession in which Wiggins, after saying he had committed the murder pursuant to a "contract", added that he "only kill[ed] on contract", and "had killed three other people" in addition to the victim named in the indictment; (3) the District Court abused its discretion by curtailing defense counsel's examination of alibi witnesses; and (4) even if the conviction is

affirmed the case should be remanded for resentencing because the District Court sentenced him as an adult without finding that he would not benefit from treatment under the Federal Youth Corrections Act.

The victim of the homicide alleged in the indictment was Henry G. Davis, proprietor of the Davis Tourist Home at 50 U Street, N.W., in Washington. At about 11:00 o'clock on the night of June 10, 1972, at the home, he was murdered by a gunman who shot him once with a .45 caliber automatic pistol. There was evidence that the gunman was seen by a neighbor who had gone to the tourist home to purchase sodas from a vending machine. As the neighbor was about to leave the home, minutes before the murder, the doorbell rang and Mr. Davis opened the door. Two men entered, one of whom addressed Davis by name. The neighbor passed the men in the doorway and left. Although she got only a glimpse of his face, and was later unable to identify him, the neighbor noticed that one of the men was wearing dark trousers and a blue jacket with gold buttons.

Police investigating the shooting found Mr. Davis' body lying at the bottom of a flight of stairs leading from the first floor to the basement. He had been shot in the chest, and the police concluded that he had been shot on the first floor and had stumbled down the stairs. There were no signs of a struggle; between $120.00 and $130.00 was found in the tourist home and change was found in Davis' pockets. Police interviewed the guests registered in the tourist home but made no progress in the investigation.

Sergeant Francisco Tadle of the Metropolitan Police Department was assigned to the case on or about June 24. Early the following morning he happened to be present at a lineup at police headquarters at which Wiggins, in custody on a charge of unauthorized use of a

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. At the time of sentencing Wiggins was serving a one-to-four year sentence for unauthorized use of a vehicle.

vehicle,[2] was to be viewed. Noting that Wiggins' home address in the unit block of T Street, Northwest, was two blocks from the tourist home at 50 U Street, Tadle asked Wiggins whether he knew anything "that went on down on the unit block of U Street." Wiggins responded that "all he knew was Davis was killed." Sgt. Tadle asked Wiggins how he knew Davis, and Wiggins responded that he had been to the tourist home with some girl friends "a couple of times". The conversation ended, and Sgt. Tadle left the lineup room and went to roll call.

At nine o'clock on the same morning, June 25, Sgt. Tadle received a telephone call from an officer in the cell block who told Sgt. Tadle that Wiggins had asked to speak with him. The sergeant went to the cell block, where Wiggins told him that he had been at the tourist home early in the evening of the murder and he had seen two suspicious men in the vicinity. At Sgt. Tadle's request Wiggins went upstairs to the homicide office where the two men talked from 10:55 A.M. to 12:35 P.M. and Wiggins made a statement which was reduced to writing and signed by him. According to this statement Wiggins had known Davis for about six months, and Wiggins and a female companion had rented a room at the tourist home at about 6:30 P.M. on June 10. Wiggins and his companion remained in the room for two or three hours. On one occasion while in the room, and on another as they were leaving the tourist home, Wiggins saw two men, whom he knew as Dap and Harold Tyler, enter the home. Wiggins returned briefly to the home to retrieve his companion's purse and inquired from the desk clerk about the presence of Dap and Tyler. He was told "Ain't nobody there." Wiggins knew Tyler and Dap as "hustlers. Tyler is a cool dude and Dap will do anything. Tyler can get people to do things for him."

**2.** See note 1 supra.

**3.** After the June 25 meeting with appellant, Sgt. Tadle showed the photo array to Leonard

Sgt. Tadle had an array of photographs prepared which included pictures of two men who were listed in the Identification Bureau under the nickname "Dap". Wiggins viewed them but made no identification, but he indicated he might be able to help the sergeant later. Subsequently on that same day Wiggins identified a photograph of William Haywood Brandon, one of the two men known as Dap, as the man who had entered the tourist home. He added that he knew Tyler and Dap as "stickup men." [3]

On June 27 Wiggins, who had been released from custody, called police headquarters and asked for Sgt. Tadle. The sergeant was out but he returned the call shortly after arriving at headquarters at 4:30 P.M. Wiggins said he wanted to speak to Tadle and invited him to his home. Sgt. Tadle and his partner, Detective Hayes, arrived at the Wiggins house at about 5:45 P.M. and remained for about twenty minutes. Wiggins told the officers that Dap still had the murder weapon, a .38. The conversation about the case was brief because Wiggins was afraid his mother and brother, who were in the house at the time, might overhear what he was saying. He wanted to speak to the officers in some other place. Since he did not want to leave in a police cruiser, Sgt. Tadle arranged to have him picked up by two officers from the Old Clothes Unit, in a private vehicle.

The "Old Clothes" officers drove Wiggins to a police parking lot where Sgt. Tadle and Detective Hayes were waiting in Tadle's cruiser. The three men got into the cruiser and Wiggins said he wanted to go to his aunt's house in southwest Washington. The officers complied with his request, and on the way, also at the request of Wiggins, stopped and bought him a "six-pack" of beer. At the aunt's house the officers waited in their car while Wiggins went in and stayed about ten minutes. When

Ward who had seen two men leaving the tourist home shortly after the shooting. Ward identified Brandon as the second man to leave the home on the night of the murder.

he came out he said his aunt felt uncomfortable about having police officers in her house and he had called his uncle, who worked at the HUD building, and arranged to get a room there where they might talk.

The officers and Wiggins arrived at the HUD building at 7:40 P.M. At Wiggins' insistence "because he wanted to make a phone call and he wanted one of us to listen in on it" they went to an office that had two telephone extensions. Before making the call Wiggins told the officers that there was a girl involved in the homicide, who let the murderers in. The officers asked him what the motive for the killing was and he responded "Well, it was because of numbers." He said that "Dave wrote numbers and somebody had hit big and Dave didn't pay off, and because of this a contract was written up and they had Dave killed because he didn't pay off." The officers expressed the view that whoever shot Davis was a coward since Davis was shot in the back, but Wiggins corrected them by pointing out that Davis was shot in the chest. Wiggins then consulted a book which appeared to contain telephone numbers, and dialed a number, after requesting the officers not to look at the number he was dialing. In his testimony Sgt. Tadle recounted the events that followed:

> And apparently whoever he asked for wasn't there because the person hung up on him and before the person was able to hang up Mr. Wiggins was asking the person not to hang up, almost to the point of begging him please don't hang up, I know he is there, but nevertheless the person hung up on him.
>
> So he paused for a moment and then he said, "Well I will call him again." He dialed the number and this time I picked up the other receiver, and when the party at the other end picked up the phone, I recognized the voice to be a young lady's voice, and she again told him that the person he was asking for wasn't there.
>
> And he said, well, how about downstairs, and she said, "I don't know. Why don't you call downstairs?"

> And she told him the number to the telephone that was downstairs at that time.
>
> And he looked up at me because, apparently, he didn't want me to know what this number was, and the girl hung up.
>
> He called the second number and I wasn't on the receiver then, but through the contents of his conversation I understood that the person wasn't there either.
>
> So he hung up and then we decided there was really nothing he was telling us and we wanted to leave.

As the two officers and Wiggins were leaving the HUD building at about nine o'clock Wiggins asked Sgt. Tadle if he could speak to him alone since he did not feel comfortable with Detective Hayes. The three went to a restaurant for sandwiches and Sgt. Tadle then dropped his partner off at police headquarters. Wiggins asked Sgt. Tadle to drive him to the home of another aunt, but Tadle refused since he was supposed to go off duty at four o'clock and now wanted to go home. Tadle did drive to the Mall area between the Capitol and the Washington Monument and there, according to Tadle's testimony the following occurred:

> As I was driving the vehicle we were approaching 7th Street, Northwest, and at that time Mr. Wiggins stated to me, "Frank, I don't know what you are going to think, but I killed Dave," and he continued to talk and he told me that there was a contract out for Dave's life and that he took it.
>
> He told me the girl let the guys in, let him and three other subjects in, and he mentioned their names.
>
> He went on to say they were Dap, Fox, and a third subject that I was never able to recall that name.
>
> He went on to say that killing Dave didn't bother him but the fact that Dave was looking at him and he was looking at Dave, face to face, when he shot him, bothered him.
>
> He knew Dave and he liked Dave and when he shot Dave in the chest

Dave turned and ran down some steps and he collapsed before he was able to finish the stairway.

And he went on and he said that the contract was for—because of numbers, and that Harold Tyler was the man that was behind it, and it was—the contract was worth $1500. He got paid $500 and he was supposed to get the other $1000 after the completion of the contract.

\* \* \* \* \* \*

He mentioned that this wasn't the first time he had killed someone. He had killed three other people. And he looked at me and said, "You want to know their names, don't you?"

I said, "No."

And then he stated, "Well, I am not crazy. I only kill on contract."

Sgt. Tadle asked Wiggins if he would go to the homicide office and give a statement. Wiggins said he would and he was glad that he had got this off his chest. At the homicide office Wiggins was placed under arrest and advised of his rights but declined to make any further statement. When arrested he was wearing blue levis and a blue jacket with brass buttons. In his pocket was the book he had consulted when making the telephone calls at the HUD building. The book contained two telephone numbers for one James Settles.

James Settles testified that he had known Wiggins since they were in school together. He identified the two telephone numbers recorded in Wiggins' book as the numbers listed to two telephones in the house where Settles lived. He testified that around 6:30 P.M. on June 27 Wiggins telephoned him and said he had

this white dude that he wanted me to burn . . . . And he said, I told the white dude that you were a bad dude, that you were a contract killer and that you were a big dope pusher. And he wanted me to say this on the telephone and he said, I want you to say that you had this dude named Davis killed because he was . . . me out of too much of my money.

And he told me to repeat it, that it was very important. And I said this on the telephone.

He said, hello there was some dirty . . . that you did to Davis, and I was supposed to say, yes, sir, I had to because Davis was . . . me out of too much of my money.

And he said, yes, that sounds real good. He said, I will call you back in about an hour or an hour and a half and he said, the white dude will be listening on the other end of the telephone and I want you to say the same thing that you said just now to him, you know, when he called me back. So I hung the telephone up and I told my grandmother if he called me back to tell him I am wanting [sic] in.

According to Settles, Wiggins called him "Pap" in this conversation. Settles asked "why did it have to be David, [sic] why can't it be Harris or Williams or something like that, and he said he had already told the white dude that it was Davis." When Wiggins called back, as he said he would, Settles did not take the call.

Continuing, Settles testified that about a week or a week and a half before this telephone conversation, Wiggins had asked him to help sell a .45 caliber automatic belonging to Wiggins. He took Wiggins to a prospective purchaser who rejected it after Wiggins had test-fired it into a board. He identified the board, which was received in evidence.

There was a reasonable inference, and the jury were justified in believing, that Wiggins called Settles from the house of Wiggins' aunt, while Tadle and Hayes waited outside in the police cruiser, and that in this call Wiggins arranged for the later calls from the HUD building.

Wiggins took the stand, denied his guilt, and denied that he had made any confession. He admitted that he had called Settles from the HUD office in the presence of the police officers. The purpose of the call, he said, was to find out if Settles had any drugs. He saw nothing strange about an attempt to arrange a drug transaction in the presence of police officers. He insisted that his

call to Settles was not by prearrangement. He denied that he had owned or attempted to sell a .45 caliber pistol but said Settles did own a gun which he, Settles, wanted to sell. According to Wiggins he took Settles to a prospective purchaser who fired the pistol twice at a piece of wood but refused to buy it.

Wiggins claimed he was at home on the night of the murder, a claim supported by testimony from his mother, sister and brother. His mother testified however that on the night when Wiggins was arrested he had called her on the telephone and "he told me that he had confessed to some kind of killing. I said, Now, listen here, you know you are not telling the truth. He said, I am sorry, Mama, that is the way it is and he hung up the phone."

## I. THE STATEMENTS OF JUNE 25

■ The statements Wiggins made to Sgt. Tadle on June 25 were received in evidence without objection. On this appeal however counsel contends that these statements should have been excluded because Wiggins did not receive the warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Asserting that Sgt. Tadle's talk with Wiggins on June 25 constituted "custodial interrogation" counsel contends that "Tadle was required to give the defendant a Miranda warning prior to his initial interrogation . . . and . . . his failure to do so rendered all of defendant's subsequent statements to the police on that day inadmissible." We do not agree.

As Sgt. Tadle testified, the only reason why he wanted to talk to Wiggins at the police lineup was that "When they read off Mr. Wiggins' name and address, his address was in the unit block of T Street, Northwest, and I was investigating a homicide that occurred in the unit block of U Street, Northwest, which is only a few blocks, . . .." In other words, Sgt. Tadle was looking for leads and hoped that Wiggins might be of some assistance. He did not suspect that Wiggins was implicated in the murder and had no reason to do so. In short, he

approached Wiggins as a possible witness or source of information; his inquiries were the functional equivalent of "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process" (384 U.S. at 477, 86 S.Ct. at 1629) which the Miranda decision does not curtail. If the appellant's contentions were sound then a police officer would be required to give the Miranda warnings to every person with whom he spoke. This is not and should not be the law.

The basis of the Miranda decision was "that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467, 86 S.Ct. at 1624. In this case, as counsel for Wiggins concedes, he was neither suspected nor accused of the Davis murder when he spoke with Sgt. Tadle on June 25. So far as the Davis case was concerned he was a possible witness or source of information, nothing more. In this respect the case differs from Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), relied upon by the appellant. In the Mathis case the defendant was in prison serving a state sentence when he was visited by a Federal Internal Revenue Agent who was investigating his tax affairs and who questioned him about two of his income tax returns. The Court held that the interrogation fell within the Miranda rule because Mathis was in custody and was the object of a tax investigation which "frequently lead[s] to criminal prosecutions, just as the one here did." 391 U.S. at 4, 88 S.Ct. at 1505. There was no doubt that Mathis was the suspect or subject in the tax investigation, and the questioning related to the returns which were the basis of the subsequent prosecution. Accordingly the interrogating agent was expected and required to give the Miranda warnings. In the case at bar Wiggins was neither a

suspect nor a prospective subject. There was nothing to suggest that the *Miranda* warnings were required because nothing suggested that Wiggins himself was the guilty man. *See* Hicks v. United States, 127 U.S.App.D.C. 209, 382 F.2d 158 (1967).

After the first brief and uninformative exchange in the lineup room every meeting between Wiggins and the police was at the request or invitation of Wiggins. He asked Sgt. Tadle to come to the cell block and volunteered information or alleged information, about two possible suspects. Any suggestion that he was subject to "compelling pressures" by his confinement on June 25 flies in the face of reality. On the contrary it is apparent that after the first casual encounter at the lineup Wiggins, on his own motion, attempted to put the police on a wild goose chase for Dap and Tyler. He became an informant, albeit an untruthful one, for motives that had nothing to do with his confinement.

## II. THE STATEMENTS OF JUNE 27

■ Throughout the late afternoon and early evening of June 27 Wiggins led Sgt. Tadle on the well planned wild goose chase. First he invited the officer to his home and then sought to switch the scene of the conversation to his aunt's house, where he arranged the Settles telephone hoax. Finally, at the instance of Wiggins, the meeting adjourned to the HUD building and a room containing two telephone extensions. During this entire time the officers treated Wiggins as a witness who was helping them in their investigation; at no time was he treated or considered as a man under suspicion or under arrest or in any way restrained. Indeed the officers wanted to break off the conversations before Wiggins was ready to do so. Thus Sgt. Tadle testified that at the HUD building "we decided there was really nothing he was telling us and we wanted to leave"; and later, after dinner, when Wiggins asked Tadle to drive him to the home of another aunt, Tadle refused because he was tired and wanted to go home. Nevertheless Wiggins continued to talk, and suddenly, without prompting from Tadle, he confessed. Sgt. Tadle was under no obligation to interrupt him when he started to confess. There is no requirement that police stop a man from talking when he voluntarily and without solicitation says he wants to confess to a crime. Miranda v. Arizona, 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); United States v. Duke, 369 F.2d 355, 358 (7th Cir. 1966), cert. denied, 386 U.S. 934, 87 S.Ct. 957, 17 L.Ed.2d 806, rehear. denied, 386 U.S. 1000, 87 S.Ct. 1302, 18 L.Ed.2d 354 (1967).

Before the trial began the court held a hearing to determine whether Wiggins' confession was voluntary. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). At the outset of the hearing the prosecutor stated

> I think it appropriate under the case law, particularly Lego v. Twomey, that the Court have a hearing on the voluntariness of that statement and at the end of that hearing the United States will request the Court to rule that the statement was in fact voluntary by a preponderance of the evidence.

At the hearing Sgt. Tadle testified in detail about the evidence that led up to the confession. The court then ruled "it was a voluntary statement; that it was not necessary to be given the Miranda warning ahead of time, because it was done on a voluntary basis, freely and voluntarily." The court did not indicate whether its ruling was based upon a preponderance of the evidence or upon proof beyond a reasonable doubt.

Relying upon Pea v. United States, 130 U.S.App.D.C. 66, 397 F.2d 627 (1968), Wiggins argues that the court was required to exclude the confession absent a finding that it was voluntary beyond a reasonable doubt. Accordingly, says Wiggins, we should remand the case for a new hearing and a determination on this issue.

■ We think a short answer to the appellant's contention is that the evidence, which we have already set out in detail, required a finding that the confession was voluntary, beyond a reasona-

ble doubt.[4] A remand would therefore serve no practical purpose. In any event the authority of Pea v. United States has been undercut by Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). In that case the Supreme Court held that the Constitution required only that the voluntary nature of a confession be proved by a preponderance of the evidence. True, in the *Pea* case this court imposed the reasonable doubt standard in exercise of its supervisory powers; but in Lego v. Twomey the Supreme Court said "[i]t is no more persuasive to impose the stricter standard of proof as an exercise of supervisory power than as a constitutional rule." 404 U.S. at 488 n. 16, 92 S.Ct. at 626. We agree with the courts that have considered this issue since the *Lego* decision and have concluded that the imposition of the reasonable doubt standard by the exercise of the supervisory power is "clearly foreclosed by the opinion of the Supreme Court." United States v. Watson, 469 F.2d 362, 365 (5th Cir. 1972). *See* United States v. Johnson, 495 F.2d 378, 383 (4th Cir. 1974); United States v. Lehman, 468 F.2d 93, 99 n. 8 (7th Cir.), cert. denied, 409 U.S. 967, 93 S.Ct. 273, 34 L.Ed.2d 232 (1972); Hawkins v. United States, 304 A.2d 279, 282 (D.C.App. 1973); United States ex rel. Graham v. Mancusi, 457 F.2d 463, 471 n. 13 (2d Cir. 1972); United States v. Cluchette, 465 F.2d 749, 754 (9th Cir. 1972); *cf.* United States v. Matlock, 415 U.S. 164, 177–178 n. 14, 94 S.Ct. 988, 996, 39 L.Ed.2d 242 (1974); United States v. Bernett, 161 U.S.App.D.C. 363, 381 & n. 140, 495 F.2d 943, 961 & n. 140 (1974).

## III. THE APPELLANT'S STATEMENT THAT HE HAD KILLED THREE OTHER PEOPLE

Before the prosecutor made his opening statement, counsel for Wiggins, forewarned by the testimony at the preliminary hearing concerning the confession, asked the court to direct the prosecutor not to refer to the part in which Wiggins said he had previously killed other men. The prosecutor agreed to omit any such reference in his opening statement but said "I can't help what the defendant said when the officer gets on the stand . . . . If the defendant makes admissions like that I am not in any position to, nor know of any requirements that I clean up his statement so that it comes out that he "had alerted everyone . . . The court deferred ruling on the prosecutor's contention, saying, "Let's take it bit by bit."

As we have said, when Sgt. Tadle recounted the defendant's confession to the jury he testified that

He mentioned that this wasn't the first time he had killed someone. He had killed three other people. And he looked at me and said, "You want to know their names, don't you?"

I said, "No."

And then he stated, "Well, I am not crazy. I only kill on contract."

Counsel for Wiggins made no objection at this time, but when the direct examination of Tadle was concluded a few moments later counsel moved for a mistrial because of the testimony "about other unrelated offenses". Counsel pointed out that he "had alerted everyone . . . that I felt that this was not a proper portion of this case and its probative value is outweighed tremendously by its inflammatory nature . . . ." The court however accepted the prosecutor's contention that "it was not his fault that the defendant made these statements to the police" and that he had no duty to exclude this portion of the confession. The motion for mistrial was therefore denied.

---

4. Counsel for Wiggins notes that while he was with the officers Wiggins drank 2½ cans of beer, and that he testified before the jury that "early during that day" he had his "first dose of methodone". However, there was no evidence that his faculties were in any way affected by either the beer of the methadone; indeed the evidence was to the contrary.

■ We think the admission of evidence concerning the three other killings was prejudicial error requiring reversal of the conviction.

■ We begin with the familiar principle that, on the trial of a defendant for one offense, evidence that he committed another is inadmissible to prove his disposition to commit crime; the jury may not be permitted to infer that the defendant is guilty of the crime charged because he committed another similar offense. Drew v. United States, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964); Bradley v. United States, 140 U.S.App. D.C. 7, 433 F.2d 1113 (1969); United States v. Bailey, 164 U.S.App.D.C. 310, 505 F.2d 417 (1974). Equally familiar are the exceptions to the rule: "Evidence of other crimes is admissible when relevant to (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of the one tends to establish the other, and (5) the identity of the person charged with the commission of the crime on trial." Drew v. United States, supra, 118 U.S.App.D.C. at 16, 331 F.2d at 90 (Footnote omitted.). Another exception may exist if a defendant in his confession of one crime refers to the commission of another offense in such a way that the confession is unintelligible if the reference to the other offense is omitted. State v. Palko, 122 Conn. 529, 191 A. 320, aff'd on other grounds, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937); cf. United States v. Liddy, 166 U.S.App.D.C. 95, 509 F.2d 428, No. 73–1565, p. 30 (decided Nov. 8, 1974).

We think the evidence that Wiggins had committed three other murders does not fall within any exception to the general rule. At most, it related to the defendant's motive for killing Davis but its "prejudicial proclivities" far outweighed its "probative virtues". Bradley v. United States, supra, 140 U.S.App. D.C. at 13, 433 F.2d at 1119. In earlier parts of his confession Wiggins admitted in detail that he killed Davis pursuant to a contract "because of numbers". Refer-

ence to the three prior contract murders was therefore unnecessary to establish a motive. Furthermore, excision of the reference to the three prior murders could easily have been made without impairing the confession. Sang Soon Sur v. United States, 167 F.2d 431 (9th Cir. 1948). Finally, the prejudice to the defendant was compounded when the court in its charge to the jury made no attempt to limit the effect of the evidence concerning the commission of prior offenses; the jury were left free to reason that because Wiggins had killed others he probably killed Davis. See United States v. McClain, 142 U.S.App.D.C. 213, 440 F.2d 241 (1971).

■ There is no support in the law for the prosecutor's theory that evidence of other crimes, otherwise inadmissible, will be admitted if it is part of a confession. On the contrary the law is plain that evidence of other offenses committed by a defendant is not automatically made admissible because the defendant referred to those offenses in a confession. Sang Soon Sur v. United States, supra. If this were not so, the scope of the evidence at trial would depend upon the extent of the defendant's garrulity when confessing; evidence of crimes unrelated to the one charged—for example the evidence held inadmissible in Boyd v. United States, 142 U.S. 450, 12 S.Ct. 292, 35 L.Ed. 1077 (1892)—would be received if mentioned by the defendant in his confession. The possibility of such a result demonstrates the fallacy of the prosecutor's theory.

## IV. THE APPELLANT'S REMAINING CONTENTIONS

On the ground that they were leading, the court sustained objections to certain questions propounded to the alibi witnesses by appellant's counsel. Counsel refused to rephrase the questions and refused to continue his examination of the witnesses. The appellant now contends that the action of the District Court was an abuse of discretion and deprived him of a fair trial. We think there was no abuse of discretion. City-Wide Trucking Corp. v. Ford, 113 U.S.

App.D.C. 198, 306 F.2d 805 (1962). Had he chosen to do so, counsel for the defendant, an experienced and competent trial lawyer, could have continued his examination of the witnesses by unobjectionable questions. In what was an obvious tactical decision he chose not to do so. The appellant's claim of prejudice is without merit.

■ Finally, the appellant argues that the District Court failed to give adequate reasons for its refusal to sentence him under the Youth Corrections Act. The record shows however that the district judge specifically considered sentencing Wiggins under the Youth Corrections Act but affirmatively found that he was "not likely to be rehabilitated through a Youth sentence". Under Dorszynski v. United States, 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974), this was all that was required.

## V. CONCLUSION

The judgment of conviction must be reversed with directions to award the appellant a new trial.

It is so ordered.