UNITED STATES of America

v.

James F. BOLDEN, Appellant.

UNITED STATES of America

v.

George E. JONES, Appellant.

Nos. 73–1384, 73–1385.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 14, 1975.

Decided June 19, 1975.

Philip L. Cohan, Washington, D. C., with whom Myer Feldman, Washington, D. C. (both appointed by this court), was on the brief, for appellants.

Albert H. Turkus, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., and John A. Terry and Brian W. Shaughnessy, Asst. U. S. Attys., were on the brief, for appellee.

Before WRIGHT and ROBINSON, Circuit Judges, and DAVIS,* Judge, United States Court of Claims.

Opinion for the court filed by Judge DAVIS.

DAVIS, Judge:

 Appellants were both convicted of felony-murder[1] and robbery,[2] and appellant Bolden of carrying a dangerous weapon without a license,[3] in connection with the death of Richard Owings, a security guard at the A&P grocery store on Benning Road, N.E., in the District of Columbia, on December 14, 1971. Finding the evidence sufficient and no material error in the general conduct of the trial, we affirm the convictions on the robbery and dangerous weapon counts. The trial judge's failure, however, to fully respond to a jury inquiry about the law of felony-murder requires us to vacate that conviction and remand for a new trial on that charge. Defects in the sentencing procedure also call for a remand for resentencing.

## I

While the testimony was not all one way, the jury could have accepted the following as proven: At about 2:00 on the afternoon of December 14, 1971, appellants entered the A&P grocery store at 1729 Benning Road, N.E., looked around for a while, bought a cupcake and a package of cigarettes, and left. Their activities evoked the attention of Loretta Pollard, a long-time cashier at the frequently-robbed store, and when they returned to the store shortly after their initial visit, Miss Pollard alerted the security guard, Mr. Owings, to their presence and expressed her opinion that the pair looked "shakey". Almost immediately thereafter, a scuffle between the pair and Mr. Owings ensued, during which appellant Jones was seen holding a silver object in the air, and appellant Bolden was seen holding the guard around his waist, and reaching for the guard's gun. The employees and the customers in the store rushed for cover, most of them running to the rear of the store. Two shots were fired, one of which, entering the guard's body in the center of his back, killed him. While those in the store remained in hiding for several minutes following the shots, there was testimony that various people heard a cash register drawer open. Aft-

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

1. D.C.Code § 22–2401 (1973), which reads in part:

 "Whoever, being of sound memory and discretion, . . . without purpose so to do kills another in perpetrating or in attempting to perpetrate any . . . robbery, . . . is guilty of murder in the first degree."

 Appellants were also charged with a count of pre-meditated first degree murder under the same section, but the count was dismissed at the close of the government's case, as was a carrying a dangerous weapon count against appellant Jones.

2. D.C.Code § 22–2901 (1973), which reads:

 "Whoever by force or violence, whether against resistance or by sudden or stealthy seizure or snatching, or by putting in fear, shall take from the person or immediate actual possession of another anything of value, is guilty of robbery, and any person convicted thereof shall suffer imprisonment for not less than two years nor more than fifteen years."

 The robbery count charged appellants with taking both $632.06 in cash, the property of

the A&P, and a pistol worth $30.00, the property of the guard, both from the possession of the guard. Appellants now attack the count as duplicitous. They are incorrect. While different parties owned the items taken, the charge is that one person—the guard—was robbed of two things, his own pistol and the money he was guarding. *See* United States v. Spears, 145 U.S.App.D.C. 284, 449 F.2d 946, 955 (1971). It is not wrong to charge in one count that one person was robbed of several items. *See* Austin v. United States, 134 U.S. App.D.C. 259, 414 F.2d 1155, 1158 (1969). In any event, defendants, represented by able trial counsel, waived any defect which might have existed by not protesting before trial. Fed.R.Crim.P. Rule 12(b)(2).

3. D.C.Code § 22–3204 (1973), which reads in relevant part:

 "No person shall within the District of Columbia carry either openly or concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefore issued as hereinafter provided, or any deadly or dangerous weapon capable of being so concealed."

er appellants fled the store, the cash registers, only two of which had been used that day, were found to be a total of $632.06 short, the missing money including a large number of $10 and $20-bills. The guard's gun was also missing.

Appellants were seen running east from the store. While a police alert describing them had been broadcast soon after the shooting [4], the appellants were actually apprehended shortly after 2:30 P.M. when Mrs. Blanche Shuler asked police to check out the two strange men who had been seen entering her house at 622 20th Street, N.E., about six blocks from the A&P.

It seems clear that one of appellants' purposes in entering the house at 622 20th Street was to find some transportation out of the area. After being refused a ride by those in the house, Jones made a phone call asking someone to pick him up at about 3:00 when the streets would be crowded.[5] Both women who spent time with Jones in the house testified that he had a bloody upper lip and that he complained that he hadn't known "this old man could hit so hard," to which Bolden was heard to reply "Yes, but I didn't plan it that way." Bolden, meanwhile, was seen counting money he had pulled from his pocket into piles of fives, tens, and twenties. On the arrival of the police, who had been alerted by Mrs. Shuler, appellants both ran upstairs into a bedroom. A gun was seen protruding from the door. The police followed, but, believing the men armed, did not go directly into the room. After placing one officer in a position on the porch roof to block any attempted escape through the bedroom window, the police convinced appellants to surrender.

A search of appellant Bolden yielded $73 in fives, ones, and one twenty and

several blank .22 caliber bullets. While searching the upstairs room in which appellants had been hiding, the police found a .38 caliber Smith & Wesson revolver hidden in a shoe box filled with trading stamps, and two coats, one between the mattress and boxsprings of the bed and the other in the bottom of the closet. Residents of the house said that they had never seen the gun or the coats before, although Mrs. Shuler did keep her trading stamps in the shoe box. The gun when found had two spent cartridges and four live rounds of ammunition. It was later discovered that the serial number of that weapon matched that on an application to purchase a revolver which Officer Owings had filled out two years earlier. The coats were identified at trial as those seen on or carried by appellants both in the A&P and in the house, although there was confusion as to who had which coat. Swab tests revealed that both Bolden and Owings, but not Jones, had recently fired or touched a freshly fired gun, and blood tests on one of the coats—the one the women at 622 20th Street saw on Jones—showed a small trace of blood. A blood test on Jones's shoes showed them to be clean of blood.

## II

Appellants' initial point is that there was insufficient evidence against them to send the case to the jury. It is unnecessary to repeat that, on review after a jury verdict of guilty, we must give the government the benefit of all reasonable inferences in assessing the sufficiency of the evidence. United States v. Mackin, 163 U.S.App.D.C. 427, 439, 502 F.2d 429, 441, cert. denied, 419 U.S. 1052, 95 S.Ct. 629, 42 L.Ed.2d 647 (1974). Only when the reviewing court is convinced that on the basis of the

---

4. The police radio run resulted in the arrest of one Ernest Lee Wray in front of his house at 721 16th Street, N.E., immediately southwest of the store. Wray was found with a concealed silver-colored pistol. Defendant Bolden attempted to suggest that Wray and his companion at the time of his arrest were in fact the people responsible for the crime, but was obviously unable to convince the jury.

5. Shortly after appellants were arrested, a woman identified as Lucille Jones arrived at 622 20th Street in a taxicab. The driver testified he was told to wait for her.

evidence no reasonable mind could fairly have found the defendants guilty without a reasonable doubt, can we overturn a conviction for lack of sufficient evidence. *See* Curley v. United States, 81 U.S.App.D.C. 389, 160 F.2d 229, 232–33, cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed.2d 1850 (1947). That standard is

■ There is, first, more than adequate basis to reject the claim that appellants were misidentified and were not shown to have been involved at all in the episode at the A&P store. The most telling item was that the gun found secreted in the room at the 20th Street house in which appellants hid was almost certainly guard Owings' gun—the serial numbers were identical and the purchase was traced to him. It is almost impossible to explain the presence of the gun at the 20th Street house without positing the presence of at least one of the appellants at the store.

In addition there was more. While understandably there was conflicting and confused testimony as to who wore which jacket, the two coats found at the 20th Street house were consistently identified as those seen at the A&P. There was undisputed testimony that the two men running from the A&P ran east, and appellants were found shortly thereafter about six blocks southeast of the store. The money missing from the store was of approximately the same denominations as that Bolden was seen counting at the house. The comments at the house, the search for a ride out of the area, and the residue tests on Bolden[6] all tend to show that the pair had been involved in some recent trouble involving the firing of a gun. As to Bolden, there was also a positive line-up

identification shortly after the incident by Miss Pollard, the A&P cashier.[7]

Bolden's defense at trial was simply misidentification. On the basis of the evidence summarized above, including the specific identification, it was not wrong for a juror to find beyond a reasonable doubt that Bolden was in fact at the A&P, and that after the shooting he fled with the guard's gun and the store's money. Jones offered the defense that he was at the most an accessory after the fact,[8] and argued this thesis to the jury. While the case against Jones is less strong than that against Bolden, we believe the jury could reasonably conclude on the basis of all the evidence, and because of the unlikelihood that Jones would have first teamed up with Bolden as the latter was running away with a pistol from a homicide, that Jones was indeed the "tall one" seen in the supermarket.

Once the appellants are placed at the A&P, there is little problem, on the sufficiency-of-the-evidence point, with the other elements of the counts charging robbery and carrying a dangerous weapon. The robbery count charged that the pistol was taken from guard Owings, and there was of course enough evidence that Bolden took the pistol, used it, and carried it away, and that Jones was directly involved with him at the time. By the same token the charge against Bolden of carrying a dangerous weapon is well supported. The testimony is less clear as to whether the money in the cash registers was then in the possession of Owings, as the robbery count specified, but we need not decide that narrow issue since the count was proved by the taking of the pistol which the jury plainly found. *See* United States v. Spears, *supra,* 449 F.2d at 955.

6. All the testimony of the people at the A&P was that the shorter man—Bolden—did most of the fighting with the guard, and was the person seen with his arms around the guard.

7. There were no positive identifications of Jones. There was one misidentification of Bolden and two misidentifications of the second man.

8. As an accessory after the fact, Jones could have received no more than 20 years imprisonment, while as an accessory before the fact or an aider or abettor he would be treated as a principal. *Compare* D.C.Code § 22–106 *with* D.C.Code § 22–105 (1973).

## III

The law of felony-murder, simple enough to lawyers in its pure statutory form, includes a number of important interpretive glosses which must be made known to the jury for it to deliberate properly on such a count. Appellants claim their jury was not so informed, and we must agree.

■ While the statute defining the crime, and the court's instructions in this case, require for conviction simply that one "kill another in perpetrating or in attempting to perpetrate any . . . robbery," we have held that mere coincidence in time between the murder and the robbery is insufficient to support a felony-murder conviction. United States v. Heinlein, 160 U.S.App.D.C. 157, 490 F.2d 725, 736 (1973). "[T]he statute embraces occasions when the jury may properly be urged to find that the homicidal act fell outside the scope of the felonious crime which the parties undertook to commit." *Ibid.* at 737. A jury may therefore acquit where it finds that the robbery was merely an afterthought following the homicide. United States v. Mack, 151 U.S.App.D.C. 162, 466 F.2d 333, 339, cert. denied, 409 U.S. 952, 93 S.Ct. 297, 34 L.Ed.2d 223 (1972).[9] On the other hand, in order to convict, the actual taking need not be found to have occurred before the killing, where the intent to rob was formed earlier, United States v. Butler, 147 U.S.App.D.C. 270, 455 F.2d 1338, 1339 n.1 (1971), and the homicide also need not be a necessary or

planned part of the robbery, United States v. Carter, 144 U.S.App.D.C. 193, 445 F.2d 669 (1971), cert. denied, 405 U.S. 932, 92 S.Ct. 988, 30 L.Ed.2d 806 (1972), or even foreseeable, United States v. Branic, 162 U.S.App.D.C. 10, 495 F.2d 1066, 1069 (1974).

■ Appellants argued that, even assuming they had taken part in a robbery, the intent to rob was formed after Owings was shot. There was evidence in the record from one of the A&P customers, Mr. William Colbert, that the guard, on hearing Miss Pollard's concerns about appellants, had actually started the scuffle with them in an attempt to force them to leave the store.[10] The jury could reasonably have inferred, as appellants requested them to do, that the shooting was an accidental result of the scuffle started by Owings, and that only after it was over, when appellants had the front of the store to themselves, did they decide to take the cash and the gun. Conversely, the jury could have rejected that position.

■ This is not a case, as was *Heinlein, supra,* where appellants were forbidden to argue their "afterthought" theory to the jury, nor is it one in which a requested instruction on that thesis was denied, as in *Mack, supra.* Absent a request, and considering that argument was permitted, we would ordinarily be hard-pressed to find plain error in the court's instruction to the jury, which was essentially a reading of the statute.[11]

---

9. In many cases, the distinction has little practical effect, since a finding of premeditation with regard to the murder allows a first degree murder conviction without consideration of the intricacies of felony-murder law. D.C.Code § 22–2401. However, in this case, the trial court dismissed the first degree murder count at the close of the government's case. If appellants are not convicted of felony-murder on retrial they may be convicted only of second degree murder or manslaughter if found legally responsible for Owings' death.

10. Even if appellants were "casing" the store preparatory to a later attempt to rob, the requisite intent to rob would not yet have arisen since it is necessary that the felony (robbery

here) have progressed beyond mere preparation to an indictable attempt before the homicide occurs. *See infra.*

11. The judge instructed the jury as follows:

Count one of the indictment charges each of the defendants with first degree murder, felony murder, and reads:

"On or about December 14, 1971, within the District of Columbia, James F. Bolden and George E. Jones did kill Richard Owings while perpetrating and attempting to perpetrate the crime of robbery, as set forth in the second count of this indictment."

Count one charges the defendants with violating Section 2401 of Title 22, of the Dis-

What makes this case different is that the jury, itself, focused its attention on the timing problem, and indicated to the court that it was confused about exactly this issue.[12] After approximately an hour and a half of deliberation, the jury sent the judge three questions:

"If it is determined that a robbery was in fact committed, does this *necessarily* imply previous intent to commit a robbery?

"Is an *accidental* killing during the commission of a robbery necessarily felony murder?

"*Given* the hypothesis that the guard accidentally pulled the trigger during the struggle, and *given* that there was intent to commit robbery, can this be felony murder?" [Emphasis in original]

While the judge did treat the question of an accidental killing by the appellants, the problems raised by question one were not resolved by the court's further charge. When the court refused to do anything more than reread the statute and the standard instruction, despite cogent requests from the jury and both government and defense counsel, it could well have left the jury with the incorrect impression that coincidence was sufficient to convict. The standard instruc-

> trict of Columbia Code, which provides in pertinent part:
> Whoever being of sound memory and discretion, without purpose so to do, kills another in perpetrating or in attempting to perpetrate any robbery, is guilty of murder in the first degree.
> The essential elements of the offense of murder in the first degree, felony murder, each of which the Government must prove beyond a reasonable doubt as to each defendant, are:
> 1. That the defendant or an accomplice inflicted an injury or injuries on the deceased from which the deceased died; and
> 2. That the defendant or an accomplice did so while perpetrating or attempting to perpetrate the offense of robbery while armed or robbery.
> It is not necessary that such a killing have been committed with the purpose and intent to do so by the defendant.
> Any killing, even if committed without purpose and intent to kill and even if acci-

tion may be sufficient in the first instance on this issue (although modification where an "afterthought" defense has been presented would not be error), but the jury's request called for a further explication of the law on this point.

 While the law in this circuit as in others is that the decision whether and how to reinstruct a jury is within the discretion of the trial court, *see* United States v. Wharton, 139 U.S.App. D.C. 293, 433 F.2d 451, 454 n.9 (1970), and cases cited, there are necessarily limits on that discretion. In Wright v. United States, 102 U.S.App.D.C. 36, 250 F.2d 4 (1957) (en banc), we pointed out that when a jury shows confusion, a trial judge is under an obligation to respond and is not, in responding, bound by the standard instruction:

> The refusal to answer the juror's question and the denial of the requested instruction constitute reversible error. The sample Durham charge was not meant to be and is not an inflexible directive to be followed by rote. It sketches the substance of what the judge "should in some way convey to the jury." Where, as here, the need for more appears, it is the duty of the judge to fill in the sketch, as may be appropriate on the basis of the evidence, to provide the jury with light

> dental, is murder in the first degree if committed in the perpetration or attempt to perpetrate robbery.
> If one person is perpetrating or attempting to perpetrate a robbery, and one or more other persons aids and abets him in so doing, and either of these persons in the course of the robbery or attempted robbery kills a human being, then both are equally guilty of felony murder, which is murder in the first degree.

**12.** The jury's problem was likely compounded by the order in which, according to the verdict sheet, they were to consider the counts. Since the verdict sheet, following the indictment, listed the felony-murder count before the robbery count, the jury apparently attempted to decide that issue first. If the underlying felony had been the first count, the jury might have been better able to develop its theory of the case before facing the legally more complex and dependent felony-murder count:

and guidance in the performance of its difficult task.

*Ibid.* at 11 (citations omitted).

Particularly where a difficult legal issue such as intent, which is not precisely defined by the statute, is the subject of the jury's inquiry, the trial court should carefully inform the jury of the law, and not allow the troubled jury to rely on a layman's interpretation of a superficially simple but actually complex statute. *See* Powell v. United States, 347 F.2d 156 (9th Cir. 1965); Bland v. United States, 299 F.2d 105, 109 (5th Cir. 1962).

 In response to the jury's questions, the trial court should have informed the jury (1) that to convict on felony-murder it was necessary that the intent to rob be formed before the homicide, *see* United States v. Mack, *supra,* 466 F.2d at 338–39; (2) that "intent" can only be proven by action beyond mere preparation, since until that time defendants could have abandoned the plan without legal liability, *see* Mumforde v. United States, 76 U.S.App.D.C. 107, 130 F.2d 411, 413, cert. denied, 317 U.S. 656, 63 S.Ct. 53, 87 L.Ed. 527 (1942); and (3) that even if the jury found a robbery did occur, that finding by itself did not settle the issue whether the intent to rob was formed before or after the homicide.[13] "Discharge of the jury's responsibility . . . depended on discharge of the judge's responsibility to give the jury the required guidance by a lucid statement of the relevant legal criteria. When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy." Bollenbach v. United States, 326 U.S. 607, 612–13, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946). *See also* United States v.

Grover, 158 U.S.App.D.C. 260, 485 F.2d 1039, 1044, 1046 (1973) (Bazelon, C. J., dissenting).

We cannot say the error was harmless—the jury had difficulty with the felony-murder count; there was evidence to support the defense theory; and the jury convicted on the basis of an instruction which did not provide them with the legal information they themselves indicated that they needed. "In view of the place of importance that trial by jury has in our Bill of Rights, it is not to be supposed that Congress intended to substitute the belief of appellate judges in the guilt of an accused, . . . for ascertainment of guilt by a jury under appropriate judicial guidance, however cumbersome that process may be." 326 U.S. at 615, 66 S.Ct. at 406. Because of the lack of "appropriate judicial guidance" in this instance, the felony-murder convictions must be reversed.[14]

## IV

Appellants also argue that, while it was correct for the government to propose to try them together, Fed.R.Crim.P. Rule 8(b), the trial court abused its discretion in refusing to grant their various motions for severance, as allowed by Rule 14. Appellant Jones made consistent and repeated motions for severance from the first pre-trial hearings through the entire trial. When during trial it became apparent that part of Jones' defense might shift full blame for the crime to Bolden, the latter also moved for severance.

 In Rhone v. United States, 125 U.S.App.D.C. 47, 365 F.2d 980 (1966), we set forth the standards under which this

---

13. The case was originally tried before our decision in United States v. Heinlein, *supra.* In that case we clarified the instructions to be given as to a person charged with aiding and abetting a felony murder to emphasize that, to convict, the jury must find that the homicide was committed "in the course of the felony and in furtherance of the common purpose to commit the felony," rather than merely coincidental with it. *Ibid.* at 732–33 & n.7. The trial court here did not give such a clarified

instruction, nor was one requested. The omission is not plain error. However, the *Heinlein* instruction should be given if there is a retrial.

14. In light of the reversal of the convictions on the felony-murder count, it is unnecessary to spell out the sufficiency of the evidence to sustain a guilty finding on that count except to say that there is adequate evidence to reverse for a new trial rather than to dismiss the charge outright. *See* Part II, *supra.*

court will require severance even though the trial court exercised its discretion in favor of proceeding with a joint trial:

> "[p]rejudice from joinder of defendants may arise in a wide variety of circumstances as, for example, where one defendant makes an inculpatory statement inadmissible against his codefendant, . . . where the defendants present conflicting and irreconcilable defenses and there is a danger that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty, and where only one defendant testifies and urges the jury to draw an adverse inference from his codefendant's silence." *Ibid.* at 981.

We have also said that severance is proper when the evidence against one defendant is "far more damaging" than the evidence against the other. McHale v. United States, 130 U.S.App.D.C. 168, 398 F.2d 757, 758, cert. denied, 393 U.S. 985, 89 S.Ct. 462, 21 L.Ed.2d 447 (1968). These standards must, however, be interpreted in light of the rule that the decision on severance is one in the first instance for the district court. *See* United States v. Leonard, 161 U.S.App.D.C. 36, 494 F.2d 955, 965 (1974).

The ground for severance most strongly urged by both defendants was that they would and did present inconsistent defenses. Bolden, while flirting with a misidentification defense, largely based on the theory that Wray, *see* note 4 *supra,* had committed the offense, rested his case more directly on self-defense and on the proposition that any intent to rob was formed after the shooting. Jones, on the other hand, maintained that he was nowhere near the A&P, although not denying that his adventures with Bolden at the 20th Street house might leave him open to liability as an accessory after the fact.

It does not seem to us that the defenses are so contradictory as to raise an appreciable danger that the jury would convict solely on the basis of the inconsistency. First, the positions are not necessarily in conflict. Jones never argued that Bolden had committed the robbery and homicide at the A&P—he merely argued that he hadn't, and that for all he knew Bolden could have been involved in another robbery. As to Bolden's defense, while it would have been convenient to show that Jones was with Bolden, this was only helpful to the defense if it could be simultaneously shown that Jones was not at the A&P—exactly what Jones wished to prove. Moreover, these defenses were not maintained with pristine consistency throughout the trial—while each defendant had his theory, both of them spent most of their time attempting to discredit both the A&P and the 20th Street witnesses without building up positive evidentiary support for either separate theory. The only defense witnesses were called by Bolden, and were used to support the position that neither defendant was at the A&P. This is a case, in short, where the defenses are tangential to one another, not on a collision course. It is not necessary in such circumstances to require severance and new trials in the face of the trial court's considered decision to deny it. *See* United States v. Lemonakis, 158 U.S.App.D.C. 162, 485 F.2d 941, 952 n. 18 (1973) cert. denied, 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974). *But cf.* United States v. Gambrill, 146 U.S.App.D.C. 72, 449 F.2d 1148, 1163 (1971) (judicial economy may be better served when antagonistic codefendants are granted separate trials).[15]

Jones also argues that severance should have been granted so that he could have called Bolden to testify that

---

15. Appellants suggest that this case is like United States v. Gambrill, *supra* where the court, while refusing to reverse the convictions because of a denial of severance, did suggest that severance would be a good idea on retrial where one defendant wished to dissociate himself from what he believed to be a totally im-

plausible alibi. 449 F.2d at 1162. If there is a retrial on the felony murder charge, we leave open the question of whether there should be a severance. It is to be noted, however, that both defendants argued that they were not at the A&P, and neither suggested where he was.

the two were not together when the offense occurred.[16] Bolden was unwilling to testify at a joint trial because the prosecution also had a statement from Bolden to the effect that not only were he and Jones together at the A&P but they had gone to look it over as a potential robbery target. While the government had agreed not to use this statement in its case in chief because it was inculpatory of Jones but inadmissible against him, see Bruton v. United States, 391 U.S. 123, 135–36, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the statement may have come out as impeachment if Bolden had testified. See Nelson v. O'Neil, 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971). This was a result both Bolden and Jones (even if there had been an instruction limiting the statement to its impeachment value and a deletion of Jones's name) could not have wanted.

The problem with this defense proposition is that the result would probably have been the same if there had been severance. There was never any intimation by Bolden that he would have been willing to testify at Jones's trial, and we can assume that if Jones had been tried first Bolden would have been most reluctant to waive his Fifth Amendment rights. Furthermore, the government's impeaching statement, placing Jones on the scene with a robbery motive, would probably have surfaced in any trial in which Bolden testified. While it is for counsel to decide whether to call a witness subject to devastating impeachment, in these circumstances the trial judge did not abuse her discretion by considering Jones's argument a makeweight with little of practical reality behind it.

■ Finally, appellants argue for severance so that the statements made at the 20th Street house—"Dag man, I didn't know this old man could hit so hard," and "Yes, but I didn't plan it that way"—could have been kept out of evidence, or so each could have cross-examined the other.[17] The argument is not convincing. Most of the evidence pointed to Jones as having made the first statement, and Bolden the second. The judge ruled that the statements were admissible as admissions of a party-opponent, each defendant adopting the other's statement. We think the trial judge correct. The remarks were made in casual conversation, out of the presence of police and immediately after the crime. Neither defendant suggested to the other that he didn't know what the other was talking about, the natural reaction if they had not recently engaged in some violent episode together—which is what the statements were offered to prove. The statements had sufficient "indicia of reliability" to be admissible against each defendant, and would have been at separate trials. See Dutton v. Evans, 400 U.S. 74, 89, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) (plurality opinion); cf. Fed.R.Evid. Rule 801(d)(2)(A), (B). In this respect severance would have served no purpose and was not required. See United States v. Leonard, supra, 494 F.2d at 968–70.

## V

■ Defendants also make two procedural arguments relating to pre-trial obligations of the prosecution. First they contend that a new trial is required because the prosecutor violated his duty under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by not providing the defense in advance with line-up sheets showing two misidentifications or with the four blank .22 caliber

---

16. Jones submitted to the court a sworn statement in which Bolden said that the two were not together when the offenses occurred. The statement did not, however, provide that Bolden would so testify in a separate trial of Jones.

17. Defendants contend that the government agreed, during a pre-trial suppression hearing,

not to use these statements. The court ruled that the government had agreed only to forego the statement Bolden made to the police to the effect that he and Jones had gone to the A&P together. Our reading of the transcript of the hearing convinces us that the government's promises were in fact so limited.

bullets found on Bolden after his arrest (these bullets would not fit guard Owings' gun). While we cannot accept the government's argument that, at least as to the bullets, counsel should have obtained the information from his client, we likewise find no reversible error. Jones did not at trial claim any prejudice from the lack of information, and his claim must fail on that ground. The line-up sheets show that counsel for Bolden was present at the line-ups.[18] The bullets were easily available to Bolden's counsel in the government's property office, where he examined the money taken from his client. In these circumstances, we cannot say defendants were prejudiced by the government's failure to explicitly inform counsel of the items complained of.[19]

Defendants also claim that they were harmed by the government's failure to disclose its witnesses prior to trial. Since this was not a capital case at the time of the trial, see United States v. Heinlein, supra, 490 F.2d at 727–28, there was no government duty to disclose the witness list. Compare Fed.R.Crim.P. Rule 16 with Proposed Fed.R.Crim.P. Rule 16(a)(1)(E); cf. 18 U.S.C. § 3432 (1970) (witness list required in capital case). In addition, the refusal of Jones's counsel to accept any material under a protective order not to disclose it to his client, coupled with evidence of threats against witnesses, supports the trial court's refusal to require a witness list.

## VI

Finally, appellants claim they were improperly sentenced, a contention we must accept. Jones was sentenced to concurrent sentences of twenty years to life for the felony-murder and two to six years on the robbery count. Bolden's sentence is twenty years to life for felony-murder, five to fifteen years for robbery, and three to ten years for carrying a dangerous weapon, all to run concurrently. The government, before sentencing, filed informations as to prior convictions for violent armed offenses of both defendants, stating that both were, because of the prior convictions, "subject to the increased punishment provided for by D.C.Code, Sec. 22–3202." We are unable to tell from the record whether the judge considered Jones's prior conviction in sentencing him. However, it is clear that she did increase Bolden's sentence on the weapons count because of the prior offense.[20] In neither case can the sentence stand.

While the D.C.Code contains at least four separate and distinct recidivist statutes,[21] all of them are subject to the

---

18. Although Bolden's trial counsel was not at the line-ups, another member of the Public Defender Service was. It is not unreasonable to expect members of the Public Defender Service or any other agency or law firm representing the same client, at different stages of the proceedings, to communicate with each other.

19. Our recent opinion to the opposite effect in United States v. Lewis, 167 U.S.App.D.C. ——, 511 F.2d 798 (1975), is distinguishable as involving a statement by the defendant to police officers which the government actually used at trial after telling defense counsel that no statement existed. The harm was far more substantial and the government's conduct far more duplicitous in that case than here. Unlike the information withheld by the prosecution in United States v. Agurs, 167 U.S.App.D.C. ——, 510 F.2d 1249 (1975), the .22 caliber bullets (which had nothing to do with Owings' .38 caliber gun which was used in the

killing and then taken to the 20th Street house) were not of central importance to the defense but merely tangential items of evidence.

20. D.C.Code § 22–3204 (1973) provides that the penalty for the first conviction for carrying a concealed weapon is a fine of not more than $1,000 or imprisonment for not more than a year, or both. However, the section also provides that on a second conviction for carrying a concealed weapon or for a conviction for that offense after a prior felony conviction, the term of imprisonment may be up to ten years.

21. In addition to D.C.Code § 22–3204, discussed above, §§ 22–104, 22–104a, and 22–3202 provide for increased penalties for a second conviction, a third felony conviction, and a second conviction for a violent offense while armed, respectively. Even assuming there will be no contest to the information when the de-

procedural requirements of D.C.Code § 23–111(b) (1973). That section requires that before the court can sentence an individual subject to increased punishment on the basis of such an information, it must "inquire of the person with respect to whom the information was filed whether he affirms or denies that he has been previously convicted as alleged in the information and shall inform him that any challenge to a previous conviction which is not made before sentence is imposed may not thereafter be raised to attack the sentence." The District of Columbia Court of Appeals has held that this requirement must be strictly followed. Smith v. United States, 304 A.2d 28, 34–35 (D.C.), cert. denied, 414 U.S. 1114, 94 S.Ct. 846, 38 L.Ed.2d 741 (1973). It was not followed as to either defendant here, and the government concedes that Jones must be resentenced because of the error.

■■■■ As to Bolden, the government says that, since his counsel conceded at sentencing Bolden's prior conviction for armed robbery, a remand is unnecessary. Our reading of the statute convinces us, following the approach of the District of Columbia Court of Appeals, that the law requires an affirmative statement *by the defendant,* after warning that failure to contest at that time will bar attack on the sentence, that he was indeed convicted of the crimes charged in the information. There are two reasons, beyond the plain wording of the statute, to read it this way. The first is that the defendant, more than his counsel, will know whether he was in fact convicted of precisely the crime charged. While he may not recognize possible legal challenges to the

conviction, he will probably be in a better position to raise some obvious issues which counsel might miss—conviction as a juvenile, two people with the same name, failure to properly record a plea to a lesser offense, etc. The second reason is that the consequences of failure to deny or contest the conviction, where contest is possible, are so great—the possibility of a life sentence being imposed on the third conviction for any felony, D.C.Code § 22–104a(a), or on the second conviction for an offense of violence while armed, D.C.Code § 22–3202—that the court must be sure that the defendant understands what he is admitting. *See* United States v. Clemons, 142 U.S. App.D.C. 177, 440 F.2d 205, 207–09 (1970), cert. denied, 401 U.S. 945, 91 S.Ct. 959, 28 L.Ed.2d 227 (1971); United States v. Marshall, 142 U.S.App.D.C. 167, 440 F.2d 195, 198–99, cert. denied, 400 U.S. 909, 91 S.Ct. 153, 27 L.Ed.2d 148 (1970); *cf.* Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). We hold, therefore, that D.C.Code § 23–111(b) must be strictly followed, and that Bolden, too, must be resentenced.

■■■■ Bolden also makes several objections to the trial court's denial of a sentence under the Youth Corrections Act, 18 U.S.C. § 5005 et seq. (1970). The judge refused even to consider Bolden for a Youth Act sentence because of D.C.Code § 22–3202(d)(1), which forbids such a sentence to those convicted for a second time of an armed offense. In addition to the problem noted above of basing the denial on the information as to armed robbery, we note that our vacation of the felony-murder count leaves Bolden as yet convicted in this proceeding only of unarmed robbery.[22] The bar

fendants are questioned upon resentencing, neither defendant will be subject to the increased penalties of § 22–3202, *see* note 22 *infra.*

**22.** The government argues that the robbery conviction, although for unarmed robbery, acts together with Bolden's earlier plea to armed robbery to invoke the statutory bar because the proofs at trial showed that the robbery was committed while armed. We think this is an incorrect reading of the recidivist statute,

D.C.Code 22–3202. While such a law does not create a separate offense but merely enhances punishment, Jackson v. United States, 95 U.S. App.D.C. 328, 221 F.2d 883, 885 (1955), and therefore there is no right to a jury trial on the issue of the prior conviction, *ibid.,* the sentencing under a recidivist statute is still a criminal proceeding and "the accused recidivist, similarly to an accused first offender, must be sheltered by suitable safeguards against an improper sentence." United States v. Clemons,

of the District of Columbia statute does not, therefore, apply. The judge also suggested that she would not consider Bolden for a Youth Act sentence because he "is not likely to be rehabilitated by the Youth Act." Standing alone such a statement may satisfy the requirement of Dorszynski v. United States, 418 U.S. 424, 444, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974); *see* United States v. Wiggins, 166 U.S.App.D.C. 121, 130, 509 F.2d 454, 463 (1975), but since the defendant must be resentenced in any event the trial judge may wish to reconsider her statement in light of the fact that the statutory bar will no longer apply.

## VII

For the reasons stated, we vacate the felony-murder convictions of both defendants, ordering a new trial, affirm the convictions on the remaining counts, and remand the case for resentencing on those counts.

So ordered.

*supra,* 440 F.2d at 208–09. This protection would be lost if the government could rely for sentencing on what it chose not to try to prove to a jury—that the defendant committed the crime of armed, not unarmed, robbery. The dichotomy in the District of Columbia statutes between the first offender and recidivist provisions for armed violent felonies, section 22–3202, and those for unarmed felonies, emphasize the Congressional purpose to treat them differently and to handle the former more harshly. The government had full opportunity to charge defendants with armed robbery and to prove that crime. Choosing not to, it cannot now deny defendants a jury trial on an element of that crime by asking the court to take judicial notice of the fact that a pistol was used in the robbery.