Albert VICTORY, Petitioner,

v.

Roy BOMBARD, as Superintendent of Greenhaven Correctional Facility, Respondent.

No. 76 Civ. 3493.

United States District Court, S. D. New York.

May 31, 1977.

William E. Hellerstein, The Legal Aid Society, New York City, for petitioner; Henry Winestine, New York City, of counsel.

Robert M. Morgenthau, Dist. Atty., New York City, for respondent; Henry J. Steinglass, New York City, of counsel.

ROBERT J. WARD, District Judge.

Albert Victory ("Victory"), a state prisoner, petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons hereinafter stated, the writ is granted.

On May 26, 1970, a jury in Supreme Court, New York County, the Honorable Irwin D. Davidson presiding, convicted Victory of felony murder. Petitioner was sentenced to twenty-five-years-to-life with a recommendation of no parole during the first twenty-five years, which he is presently serving at Greenhaven Correctional Facility. The conviction was affirmed by the New York courts. *People v. Victory*, 38 A.D.2d 689, 327 N.Y.S.2d 544 (1st Dep't 1971), *aff'd sub nom., People v. Bornholdt*, 33 N.Y.2d 75, 350 N.Y.S.2d 369, 305 N.E.2d 461, *cert. denied*, 416 U.S. 905, 94 S.Ct. 1609, 40 L.Ed.2d 109 (1974). Victory's motion for leave to reargue in light of the subsequent United States Supreme Court decision in *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), was denied on June 15, 1976. *People v. Victory*, —— N.Y. 2d ——.

Petitioner asserts three constitutional claims for habeas corpus relief:

1. He was denied his sixth and fourteenth amendment right of confrontation by the trial judge's refusal to allow impeachment of testimony on a critical issue given by the principal prosecution witness;

2. He was denied due process under the fifth and fourteenth amendments by the trial judge's failure to instruct clearly on the meaning of an element of felony murder;

3. He was denied due process under the fifth and fourteenth amendments by being required to bear the burden of proof by a preponderance of the evidence on the four elements of New York's affirmative defense to felony murder.

## FACTS

█ Felony murder charges usually arise out of a crime of violence or potential violence, the prototype being armed robbery which culminates in a shoot out. The apparent rationale for felony murder prosecutions is to deter felons from acting in such a manner as to increase the likelihood of violence (e.g., to deter carrying arms). For this reason, the law has come to accept punishing the non-killing accomplice to the underlying felony. The peculiar facts of this case, however, do not approach the prototypical felony murder scenario to which this rationale applies.

Sometime around 1:00 A.M. on a rainy October 7, 1968, the murder victim, Patrolman Varecha ("the Patrolman"), was standing in uniform on the corner of 5th Avenue and 54th Street in New York City. He observed a car speed through a red light at that intersection. The Patrolman thereupon commandeered a cab which chased the speeding car a few blocks through another red light to its destination, Arthur's Discotheque, on 54th Street and 3rd Avenue.

Four people, Francisco and Donna Garcia, Theresa Gentry and Maureen LaGuardia, were standing under the awning at Arthur's when the car pulled up. In varying degrees they observed the incident that was about to unfold.

Victory and his co-defendant Robert Bornholdt ("Bornholdt") got out of the car, laughing and joking, and made their way toward Arthur's. At approximately the same time, the Patrolman alighted from the commandeered cab and demanded the license and registration of whoever had been driving the car. Victory, who had been driving without a license, "wised-off" with the Patrolman, telling him, while spinning the car keys around his fingers, that they had not come by car. When the Patrolman asked how they had come, Victory responded, "By truck." As they proceeded to ignore the Patrolman's demand and entered Arthur's, the Patrolman blocked their access with his nightstick and again demanded the license and registration. When Victory remained uncooperative, the Patrolman threatened to have the car towed away. At that point a verbal and physical altercation ensued.

The prosecution witnesses, particularly Francisco Garcia ("Garcia"), their main witness, depict Victory as the aggressor. Garcia testified that at some point Victory, after telling Bornholdt to stay out of it, that Victory would take care of it, lifted the Patrolman off the ground by his jacket and then kicked the Patrolman in the groin. The Patrolman doubled over in pain and then rose and clubbed both Victory and Bornholdt on their heads with his nightstick with such force as to cause them to bleed. The Patrolman then drew his gun and told them they were under arrest.

Instead of immediately submitting to the arrest, Victory slowly backed away. Bornholdt kept to the Patrolman's other side, preventing him from keeping his eyes on both of them. Throughout this entire time, Garcia remained nearby the Patrolman, and at one point earlier actually came to the Patrolman's defense and as a result was kicked and assaulted by Bornholdt. Garcia testified that Victory gradually backed down an alley, drawing the Patrolman, followed by Bornholdt, and Garcia, therein. While in the alley Victory shouted to Garcia "Get the cop, Get the cop," and/or "Get a cop. This guy is crazy." Garcia replied that he was with the cop. He was then ordered, first by Victory and then by Bornholdt, to get out of the way and mind his business. At the entreaties of his wife Garcia turned around to retreat. At that point the shooting began. When he turned back, Garcia saw Victory and Bornholdt "scuf-

fling" with the Patrolman and observed a flashing burst come from the silhouette of a gun in Bornholdt's hand. First Bornholdt, and then Victory, fled separately.

## THE FELONY MURDER THEORY

Victory was charged with felony murder under *N.Y.Penal Law* § 125.25 (McKinney 1967) (*"Penal Law"*).[1] One of the elements of that crime is that there must be an underlying felony or attempted felony on which to predicate "felony murder," and the predicate felony must be one of the particular felonies enumerated in *Penal Law* § 125.25. In this case the predicate felony was escape in the second degree.

Section 205.10(2) of the *Penal Law* defines escape in the second degree as flight from an arrest for a felony. Here the felony arrest that formed the basis for second degree escape was arrest for second degree assault.

Second degree assault is defined in *Penal Law* § 120.05(3) as causing physical injury to a peace officer with intent to prevent him from performing his lawful duty. Physical injury is defined in *Penal Law* § 10.00(9) as "impairment of physical condition or substantial pain." In this case, the physical injury forming the basis of the arrest for felonious assault was Victory's kicking the Patrolman in the groin.

In addition to having to prove beyond a reasonable doubt the kick in the groin, the arrest therefor, and subsequent flight and shooting, the prosecution also had to prove beyond a reasonable doubt that Victory's and Bornholdt's escape was pursuant to a common plan or intent to escape which was formulated prior to the shooting, and that the shooting was "in the course of and in furtherance" of the preconceived plan of escape.

1. That section provides in part:
 A person is guilty of murder in the second degree when:

 . . . . .

 3. Acting either alone or with one or more other persons, he commits or attempts to commit robbery, burglary, kidnapping, arson, rape in the first degree, sodomy in the first

## CONSTITUTIONAL CLAIMS

I. *Was Victory Denied His Right of Confrontation by the Restriction on Impeachment of the Principal Prosecution Witness*

Petitioner claims that his constitutional right of confrontation was violated by rulings at trial which prevented him from demonstrating that in statements given the night of the murder Garcia did not state that Victory had kneed the Patrolman in the groin.

As noted above, Victory's kneeing the Patrolman in the groin was the basis for the felony assault arrest, which was the predicate for the underlying felony of second degree escape on which the felony murder charge ultimately rested. Therefore, proof beyond a reasonable doubt of the kneeing incident was essential to a conviction for felony murder.

At trial, Garcia testified in great detail concerning the events which he witnessed on the morning of October 7, 1968. On direct examination, Garcia stated that he saw Victory knee the Patrolman in the groin and he saw the officer crouch over in pain. In addition, Garcia stood in front of the jury and dramatically re-enacted his testimony of the kneeing incident twice more.

Before cross-examination began, the prosecution turned over to defense counsel, pursuant to *People v. Rosario*, 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881, *cert. denied*, 368 U.S. 866, 82 S.Ct. 117, 7 L.Ed.2d 64 (1961), the following five pre-trial statements made by Garcia:

1. Handwritten notes taken by Detective Byrne ("Byrne") on October 7, 1968;

2. A typed revision of the notes taken by Detective Byrne;

degree, sexual abuse in the first degree, escape in the first degree, or escape in the second degree, and, in the course of and in furtherance of such crime or of immediate flight therefrom, he, or another participant, if there be any, causes the death of a person other than one of the participants.

3. Handwritten notes taken by Assistant District Attorney Dannett ("Dannett") dated October 7, 1968;

4. A transcript of an interview of Garcia by Dannett recorded by a stenographer at 4:45 A.M. on October 7; and

5. Garcia's statement to the Grand Jury in October 1968.

Two of these statements, the Grand Jury testimony and the handwritten notes of Dannett, contain references to the kneeing incident. In the Grand Jury, Garcia testified that it was Victory who kicked the Patrolman, while in Dannett's handwritten notes, the person doing the kicking was not identified.

The stenographically transcribed interview of Garcia by Dannett clearly contains no reference to the kneeing incident, but there was no specific question propounded on that subject either. The two statements taken by Detective Byrne are somewhat ambiguous. Detective Byrne's handwritten notes state as follows:

> I jumped on tan guys [Bornholdt] back & the tan one struck *him* & kicked *him* in the groin & the tan one said mind your own business—& get the hell out of here. (emphasis added)

Petitioner contends that in this passage, Garcia was referring to the kick which Bornholdt gave to Garcia. The prosecution claims, on the other hand, that the word "him" refers to the officer and that it was the officer who was kicked by *Bornholdt*.[2] It should be noted that in the rest of the handwritten notes by Byrne, the Detective recorded Garcia's references to himself in the first person as "I" or "me" and not as "he" or "him." However, in the Detective's typed revision of the notes, the pronoun was changed as follows:

> I jumped on the tan guys back and the tan one struck *me* and kicked *me* in the groin and about my body several times and said mind your own business and get the hell out of here. (emphasis added)

This version clearly states that Garcia, not the Patrolman, was kicked by Bornholdt, not Victory, and the correction indicates that when Detective Byrne wrote down "him" he understood it to mean Garcia, not the Patrolman. In sum, then, the handwritten and typed Byrne notes do not mention Victory's kicking the Patrolman.

On cross-examination at trial, Garcia repeated his testimony regarding Victory's kneeing of the Patrolman and the Patrolman's subsequent crouching over. Defense counsel wanted to impeach this testimony by demonstrating that Garcia had failed to mention the kneeing assault in the statements given to Byrne and Dannett. However, counsel's repeated efforts were all unsuccessful.

Petitioner claims that the trial court's limitation of the cross-examination of Garcia regarding his failure to mention the kneeing incident in prior statements violated his right of confrontation under the sixth and fourteenth amendments.

Federal habeas corpus review of evidentiary rulings in a state criminal trial is limited to errors of constitutional dimension. *Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973); *United States ex rel. Stanbridge v. Zelker,* 514 F.2d 45, 50 (2d Cir.), *cert. denied,* 423 U.S. 872, 96 S.Ct. 138, 46 L.Ed.2d 102 (1975); *United States ex rel. Castillo v. Fay,* 350 F.2d 400, 401 (2d Cir. 1965). Ordinarily, the trial judge has broad discretion in controlling the extent of cross-examination, *United States v. Finkelstein,* 526 F.2d 517, 529 (2d Cir. 1975), *cert. denied,* 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976); however, "this principle cannot be expanded to justify a curtailment which keeps from the jury relevant and important facts bearing on the trustworthiness of crucial testimony." *United States v. Harris,* 501 F.2d 1, 8 (9th Cir. 1974), *quoting Gordon v. United States,* 344 U.S. 414, 423, 73 S.Ct. 369, 97 L.Ed. 447 (1953).

2. Even if this interpretation is correct, it does not support the prosecution theory which is that *Victory* kneed the officer.

 The Supreme Court has recognized that the right to an effective cross-examination is an important aspect of the right to confrontation, *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), the denial of which is a "constitutional error of the first magnitude" which "no amount of showing of want of prejudice would cure." *Brookhart v. Janis,* 384 U.S. 1, 3, 86 S.Ct. 1245, 1246, 16 L.Ed.2d 314 (1966). Cross-examination is a crucial tool of defense counsel for testing the accuracy of testimony by prosecution witnesses. *Davis v. Alaska, supra,* 415 U.S. at 316, 94 S.Ct. 1105. The use of prior inconsistent statements is an accepted means of impeaching the credibility of a witness. *United States v. Hale,* 422 U.S. 171, 176, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975); 3A J. Wigmore, *Evidence* § 1040 (J. Chadbourn rev. 1970). To omit a fact when it would have been natural to assert it on the prior occasion is inconsistent with the assertion of the fact at trial. Wigmore, *supra* ; C. McCormick, *Evidence* § 34 (2d ed. 1972). *See also Jencks v. United States,* 353 U.S. 657, 667, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957).

 The question before the Court is, therefore, whether the trial court's limitation of the cross-examination of Garcia "deprived [petitioner] of a fundamentally fair trial in violation of the due process clause of the Fourteenth Amendment." *Welcome v. Vincent,* 549 F.2d 853 (2d Cir. 1977). *See also Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

Garcia was the prosecution's main witness, which made a full and searching cross-examination most essential. *United States v. Brown,* 546 F.2d 166, 170 (5th Cir. 1977). Furthermore, as emphasized previously, the kneeing incident was crucial to the prosecution's case, and the omission of any reference to it in two or three of the statements given the night of the incident is of utmost significance because under the circumstances it would have been natural to mention it. By contrast, at the time these statements were given, Garcia thought to mention many details which were literally minutiae in comparison to a kick which allegedly incapacitated or impaired the Patrolman and triggered the latter's response of clubbing Victory and Bornholdt over the heads and drawing his gun. Therefore, Garcia's omission of the kneeing incident in all but one statement would have reflected upon his credibility as a witness and might have raised doubts as to the credibility of the other witnesses who corroborated either the kneeing or the Patrolman's subsequent crouching over.

In addition, because defense counsel repeatedly laid the foundation without subsequent impeachment, "the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness." *Davis v. Alaska, supra* 415 U.S. at 318, 94 S.Ct. at 1111.

Nor, in contrast to *Davis v. Alaska, supra,* and *Robinson v. Chesney,* D.C.Conn., 403 F.Supp. 306, *aff'd without opinion,* 538 F.2d 308 (2d Cir.), *cert. denied,* 429 U.S. 867, 97 S.Ct. 177, 50 L.Ed.2d 147 (1976), were there any countervailing policy reasons to exclude the impeaching evidence. The prosecution would have been given the opportunity to explain any of the omissions in the prior statements. Because the kneeing incident was one of the facts which the prosecution had to prove beyond a reasonable doubt in order to convict petitioner of felony murder, the jury, as the trier of the facts, should have been given the opportunity to hear all the evidence in order to pass upon the reliability of all of the witnesses', and particularly Garcia's, testimony regarding this critical fact.

In deciding whether this limitation of cross-examination was of constitutional magnitude, this Court is not required to find that had the inquiry been permitted the jury would have come to a different result. In *Davis v. Alaska, supra* 415 U.S. at 317, 94 S.Ct. at 1111, the Supreme Court stated:

We cannot speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted this line of

reasoning had counsel been permitted to fully present it. But we do conclude that the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on Green's testimony which provided "a crucial link in the proof . . . of petitioner's act." *Douglas v. Alabama,* 380 U.S. [415] at 419, [85 S.Ct. [1074] at 1077, 13 L.Ed.2d 934.

Nonetheless, the Court is of the opinion that any error in this case either does not rise to a constitutional level, or else despite constitutional error it was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *United States v. Duhart,* 511 F.2d 7, 10 (6th Cir.), *cert. denied,* 421 U.S. 1006, 95 S.Ct. 2409, 44 L.Ed.2d 675 (1975). This conclusion is based on the fact that even if the impeachment attempts had been successful, a number of factors tended to undercut the potential effect of such impeachment. First, the jurors would also have had before them Dannett's handwritten notes in which the kick was mentioned. Moreover, Garcia's wife also testified to the kneeing incident, and Theresa Gentry and Maureen LaGuardia testified that they saw the Patrolman crouching over. Lastly, the overall cross-examination was lengthy and did include readings from selected portions of the pre-trial statements regarding other matters.

With respect to the Byrne statements, had defense counsel juxtaposed a reading of the precise impeaching matter with the foundation he had laid it is reasonable to conclude that the judge would have allowed it. With respect to the Dannett transcript, it appears that the judge's ruling resulted in part from impatience with the lengthy and inartistic cross-examination, highlighted by defense counsel's insinuation that Garcia *never* mentioned the kneeing incident prior to the Grand Jury.

In sum, the Court does not believe that the net effect of the evidentiary rulings was to deny Victory his right of confrontation.

## II. *Was Victory Denied Due Process by a Failure to Instruct on the Meaning of an Element of Felony Murder*

■ In order for felony murder to have been predicated on the felony of second degree escape, the killing by Bornholdt had to have been in the course of or in furtherance of a common plan of escape by Victory and Bornholdt. Thus, the intent or attempt to escape would have had to have been formulated prior to or contemporaneous with the shooting; otherwise Victory would have been guilty of escape, but not felony murder. *People v. Joyner,* 26 N.Y.2d 106, 308 N.Y.S.2d 840, 257 N.E.2d 26 (1970). Clearly, then, the timing of the escape, or intent or attempt to escape, was critical.

To impart this distinction to the jury, defense counsel requested that the jury be charged:

In order for you to convict the accused, Albert Victory, of the crime of felony murder, you must find that the prosecution has proven beyond a reasonable doubt that *prior to or contemporaneous with the killing,* Victory formed an intent to escape from the custody of the Patrolman and attempted to so escape, and that the killing occurred in the course of and in furtherance of that attempted escape. *If the accused Albert Victory formed an intent to escape for the first time following the shooting and then fled from the scene of the shooting, he would not be guilty of felony murder and you must find him not guilty.* If you have a reasonable doubt whether, prior to the shooting, Victory intended to escape from the custody of the Patrolman, you must acquit him of felony murder, the only crime charged in this indictment. (emphasis added)[3]

The trial judge declined to give this instruction, charging instead the bare lan-

---

3. On numerous occasions throughout the jury deliberations defense counsel urged the court to make this distinction for the jury.

guage of the statute, namely that the killing had to be "in the course of and in furtherance of" escape or attempted escape, or in "immediate flight therefrom." The "immediate flight therefrom" language logically could not have been applicable to the underlying felony of escape (how can one flee from an escape?), and may have confused the jury.[4] Aside from that, the main charge was minimally adequate insofar as it contained the statutory language encompassing the timing element, although the judge did decline to instruct the jury on the meaning of that language.

Subsequently, however, the jury three times sought further instruction on escape and asked to rehear testimony which appears relevant to that inquiry. Finally, at 9:56 P.M. on the second day of deliberations, and after all the previous instructions, the jury asked:

As a matter of law, does the fact of flight after the shooting itself establish escape in the second degree after an arrest has been made for felony assault?

The judge responded:

Now, ladies and gentlemen, that question does not in law permit of a categorical yes or no answer in the form in which it is posed to me. In the form in which this is phrased, I cannot give you a legal answer categorically yes or no, but I will try and make it all very clear to you and see whether or not this does not answer the question from a legal standpoint for you.

Now, first, I want to make it perfectly clear that in order that you find that the crime of escape in the second degree occurred, you must be convinced beyond a reasonable doubt that a defendant was arrested for a felony, as, for example, assault in the second degree; and that the defendant, such defendant, a defendant refused to submit to the authority of the arresting officer or challenged or resisted the arrest; and that a defendant escaped from custody.

You must find that, in order to find that the crime of escape in the second degree occurred, you must be convinced beyond a reasonable doubt that (1) a defendant was arrested for a felony, as, for example, assault in the second degree; (2) that a defendant refused to submit to the authority of the arresting officer or challenged or resisted the arrest; and (3) that a defendant escaped from custody.

Now, there is no doubt that—I told you that—the arresting officer here is a policeman, that is, a peace officer; he comes within that definition; and I told you what the law meant by "custody"; I explained that very clearly.

*Now, flight after a shooting in and of itself does not necessarily constitute escape in the second degree. However, flight after a lawful arrest by a policeman for the felony of assault in the second degree does constitute the crime of escape in the second degree, whether that flight takes place before or after the shooting.*

Is that clear?

Now, in other words, you have got to find things in this order: You must find them beyond a reasonable doubt. (1) That there was the felony of assault in the second degree; (2) that as a result of that assault in the second degree, there was a lawful arrest; and (3) that following that lawful arrest there was flight from the custody of that arrest.

Now, lastly, I am going to read once again subdivision 3 of section 125.25 of our Revised Penal Law, which says: "That a person is guilty of murder when, acting either alone or with one or more other persons, he commits or attempts to commit escape in the second degree and, *in the course of and in furtherance of such crime, or of immediate flight therefrom,* he or another participant, if there

---

**4.** The inclusion of "or in immediate flight therefrom" may have confused the jury in that it may have suggested that immediate flight *from the murder,* as opposed to the underlying felony, would have been sufficient for felony murder purposes. That this may have been the jury's understanding is bolstered by their question, see *infra,* concerning the legal significance of *"flight* after the shooting."

be any, causes the death of a person other than one of the participants." (Tr. 3176–78) (emphasis added)

Defense counsel objected to this supplementary instruction on the ground that it did not delineate the time element, and in fact misled the jury into thinking that escape after the shooting would be sufficient to convict on felony murder.[5] About an hour later, at 11:42 P.M., the jury came back with convictions on felony murder.

Victory claims that the trial judge's repeated failure to delineate expressly the time element with respect to the predicate felony of second degree escape, compounded by the alleged confusion engendered by the supplementary instruction, denied him due process in that the failure to clearly charge an element led the jury to convict him erroneously of felony murder.

Before reaching the merits of this claim it is necessary to address the respondent's assertion that on this issue Victory did not raise a due process argument in the state courts and therefore he has failed to meet the exhaustion requirement of *Picard v. Connor,* 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971).[6]

### EXHAUSTION

In *Picard,* the Supreme Court explained the policy underlying the exhaustion requirement:

The exhaustion-of-state-remedies doctrine, now codified in the federal habeas statute, . . . reflects a policy of federal-state comity, . . . "an accommodation of our federal system designed to give the State an initial 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." . . . We have consistently adhered to this federal policy, for "it would be

unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation."

*Id.* at 275, 92 S.Ct. at 512 (footnote and citations omitted).

In light of this policy the Court then went on to explain what a habeas corpus petitioner must do in order to fulfill the exhaustion requirement:

[T]he federal claim must be *fairly presented* to the state courts. If the exhaustion doctrine is to prevent "unnecessary conflict between courts equally bound to guard and protect rights secured by the Constitution," . . . it is not sufficient merely that the federal habeas applicant has been through the state courts. The rule would serve no purpose if it could be satisfied by raising one claim in the state courts and another in the federal courts. Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies. Accordingly, we have required a state prisoner to present the state courts with the same claim he urges upon the federal courts.

*Id.* at 275–76, 92 S.Ct. at 512 (emphasis added, citation omitted).

"Fairly presented" means "whether, on the record and argument before it, the [state court] had a fair opportunity to consider the [asserted] claim and to correct that asserted constitutional defect." *Id.* at 276, 92 S.Ct. at 513.

Thus, the question before this Court is whether "the substance of the constitutional claim has been presented to the state

---

5. MR. POLLINA: Your Honor, may I respectfully take exception to the instructions given to the jury with regard to what the law is. Your Honor did not tell that jury that, in determining whether or not there is a felony murder, they must consider whether or not the escape took place at the same time that the homicidal act took place; and *Your Honor has definitely left an impression with that jury that*

*the flight after the homicidal act would be sufficient for purposes of making out a felony murder.* That is not the law, and I would take an exception to the instructions given by the Court to the jury.

(emphasis added)

6. It is undisputed that there has been exhaustion on the other two issues.

courts in a fashion which provides them a 'fair opportunity' to consider it," *Anderson v. Casscles,* 531 F.2d 682, 684 (2d Cir. 1976), or whether "[t]he most that can be said with respect to petitioners' contentions in the state courts . . . is that they urged [a violation of] their rights *under state law.*" *Cameron v. Fastoff,* 543 F.2d 971, 977 (2d Cir. 1976) (emphasis in original). Accordingly, the Court will now examine the manner in which petitioner raised the jury instruction issue in the New York courts.

In the Appellate Division and New York Court of Appeals, Victory attacked the jury instruction in the following manner: [7]

### POINT I

Appellant Victory's conviction for felony murder was against the weight of evidence and unlawful because:

. . . . .

(c) the evidence shows that Victory left the scene of the homicide after Bornholdt shot Varecha and thus the homicide did not occur during the course of a felony.

Albert Victory has been condemned to a term of life imprisonment for the felony murder of a police officer who was shot and killed by another person. *His conviction raises the gravest constitutional doubts.* Among those which loom largest in the wake of the judgment below, are:

. . . . .

(2) The undisputed evidence shows that Victory left the scene of the homicide sometime after Bornholdt shot Varecha and therefore Victory's alleged attempted escape did not occur during the course of the commission of any felony;

(emphasis added)

---

7. Brief for Appellant Victory at 11, *People v. Victory,* 38 A.D.2d 689, 327 N.Y.S.2d 544 (1st Dep't 1971); Brief for Appellant Victory at 10–11, *People v. Bornholdt,* 33 N.Y.2d 75, 350 N.Y.S.2d 369, 305 N.E.2d 461 (1974).

8. See Brief for Appellant Victory at 21–26, *People v. Victory, supra;* Brief for Appellant Victory at 21–25, *People v. Bornholdt, supra.*

Victory went on to attack the trial judge's failure to explicitly instruct and reinstruct the jury on the timing of the escape.[8] Thus, the same facts that Victory argues in this petition were argued in the New York courts.

The legal theory of Victory's argument to the New York courts was that he was convicted as a result of jury instructions that were erroneous in that they misstated the New York law on felony murder in failing to accurately delineate each of the elements. Victory did not cite or discuss any federal cases nor did he make even a passing reference in the body of his argument to due process or unconstitutionality. In contrast, some of Victory's other arguments were explicitly grounded on constitutional claims.[9] For these reasons, the Court attaches little weight to the broad prefatory statement in his New York briefs that "[h]is conviction raises the gravest constitutional doubts." Despite this catch-all phrase, the Court must conclude that Victory did not make an explicit constitutional argument in the New York courts. *See, e. g., United States ex rel. Gibbs v. Zelker,* 496 F.2d 991, 993–94 (2d Cir. 1974); *Nelson v. Zelker,* 465 F.2d 1121, 1124–25 (2d Cir.), *cert. denied,* 409 U.S. 1045, 93 S.Ct. 544, 34 L.Ed.2d 497 (1972); *United States ex rel. Aloi v. Arnold,* 413 F.Supp. 1384, 1387 (S.D. N.Y.1976) (Weinfeld, J.).

However, this Court must not overlook that in *Picard, supra,* the Supreme Court also stated:

Obviously there are instances in which "the ultimate question for disposition," . . . will be the same *despite variations in the legal theory* or factual allegations urged in its support. . . . Hence, *we do not imply that respondent could have raised the equal protection claim only by citing "book and verse on*

---

9. *E. g.,* Brief for Appellant Victory, *People v. Victory, supra:* Point I(b) (privilege against self-incrimination); Point II (denied due process by joint trial); Point III (right of confrontation under sixth amendment to the United States Constitution).

*the federal constitution."* . . . We simply hold that the *substance* of a federal habeas corpus claim must first be presented to the state courts.

404 U.S. at 277–78, 92 S.Ct. at 513 (emphasis added, citations omitted).

*Accord, United States ex rel. Gibbs v. Zelker, supra.*

Thus, the question becomes whether Victory's due process claim, though not "denominated as such [was] spelled out in substance" in his New York appeals. *See United States ex rel. Gibbs v. Zelker, supra* at 993; *United States ex rel. Rosner v. Commissioner, New York State Dep't of Correction,* 421 F.Supp. 781, 783 n.1 (S.D.N.Y.1976); *Chesney v. Robinson,* 403 F.Supp. 306 (D.Conn.1975), *aff'd without opinion,* 538 F.2d 308 (2d Cir.), *cert. denied,* 429 U.S. 867, 97 S.Ct. 177, 50 L.Ed.2d 147 (1976).

In *Picard,* the petitioner had "challenged the validity of his indictment at every stage of the proceedings in the [state] courts." 404 U.S. at 276, 92 S.Ct. at 512. However, the basis of his state court challenge was that he had been improperly indicted under state law. *Id.* at 277, 92 S.Ct. 509. The constitutional issue—denial of equal protection—was raised for the first time by the United States Court of Appeals reviewing the habeas corpus petition. Thus, the Supreme Court concluded:

> To be sure, respondent presented all the facts. Yet the constitutional claim the Court of Appeals found inherent in those facts was never brought to the attention of the state courts. The [state] Court dealt with the arguments respondent offered; we cannot fault that court for failing also to consider *sua sponte* whether the indictment procedure denied respondent equal protection of the laws. *Id.*

The Court reached this conclusion because "[t]he claim that an indictment is invalid is not the substantial equivalent of a claim that it results in an unconstitutional discrimination." *Id.* at 278, 92 S.Ct. at 513.

That there is a difference in theory between challenging the validity of an indictment and asserting denial of equal protection is apparent. However, it is not so clear whether there is a difference in theory between asserting that a jury instruction is erroneous under state law for failing to accurately delineate each element of the crime, and asserting that the incomplete or misleading instruction denied petitioner due process by causing him to be convicted of an act which is not a crime by New York's definition.

It appears to the Court that this latter theory advanced by Victory in this petition is neither different nor identical to the theory advanced in the state courts. Rather, the two theories are interrelated as in *United States ex rel. Gibbs v. Zelker, supra.*

In *Gibbs,* the petitioner asserted in state court that his detention violated state law in that the confinement order was signed by an acting police justice. The Second Circuit stated:

> we would hardly insist that the asserted inadequacy of the acting police justice's signature be raised in the state court in the specific garb of a federal constitutional question, so long as it had been adequately litigated there as a state question and the Fourth Amendment claim rested entirely on alleged violation of state procedural requirements . . . . .
>
> 496 F.2d at 994.

Likewise, in the instant petition, the due process claim is dependent upon and is the logical extension of an assertion of reversible error in the failure to clearly charge each of the elements of the crime. Conversely, the state courts' rejection of Victory's claim that the charge was incomplete and misleading would necessarily have precluded the state courts from finding a violation of due process, had a due process claim been explicitly addressed to them. Thus it is reasonable to conclude that the state courts would not now find that an instruction they have already upheld violated due process.

Since "the state courts [have already had] an opportunity to set their own Constitutional houses in order," *Fielding v. LeFevre,* 548 F.2d 1102, 1106 (2d Cir. 1977), comity

does not require this Court to refrain from ruling. Furthermore, because it would be futile for Victory to reassert essentially the same claim, though differently denominated, justice would not be served by giving the state courts another chance to scrutinize the same jury instructions while Victory continues to serve his twenty-five-years-to-life sentence.[10] Accordingly, the Court holds that there has been exhaustion on the jury instruction issue.[11]

## THE EFFECT OF THE INSTRUCTION

 Turning to the merits, the starting point must be the oft-quoted language of *Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973):

> In determining the effect of this instruction on the validity of respondent's conviction, we accept at the outset the well-established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . [T]he question is not whether the trial court failed to isolate and cure a particular ailing instruction, but rather whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.

However, the Supreme Court also stated that "this does not mean that an instruction by itself may never rise to the level of constitutional error." *Id.* at 147, 94 S.Ct. at 400. This Court holds that in the peculiar circumstances of this case, it has risen to constitutional dimension.

> If justice is to be done in accordance with the rule of law, it is of paramount importance that the court's instructions be clear, accurate, complete and comprehensible, particularly with respect to the es-

sential elements of the alleged crime that must be proved by the government beyond a reasonable doubt.

*United States v. Clark*, 475 F.2d 240 (2d Cir. 1973). "Complex legalisms must be translated into simple prose that will be understandable by the average layman. . . . Terms of legal significance should be defined in a way that will be understood." *Id.* at 250. Although *Clark* involved appellate review of a federal conviction, rather than habeas corpus review of a state conviction, its directive that jury instructions, including legal terms, must be understandable is relevant to a due process inquiry.

The Court must first inquire whether the jury understood that "in the course of and in furtherance of" escape ("or in immediate flight therefrom") meant that if Victory's intent to escape was not formulated until after the shooting they would have to acquit him of felony murder. Notwithstanding the number of times the judge instructed on the elements of escape and read the felony murder statute, the fact that the jury still had to ask whether "the fact of flight after the shooting *itself* establish[ed] escape" implies that they did not find an intent to escape prior to the shooting.

"In the course of and in furtherance of" is a legal term of art which may, and on the facts of this case did, require some explanation. For example, due to the absence of explanation of these terms, the jury may have erroneously thought that because the shooting enabled Victory to escape, *i. e.,* because his escape in fact was *furthered by* the shooting, they could conclude that the shooting was "in furtherance" of the escape.

10. *See Hallowell v. Keve*, 412 F.Supp. 681, 685 (D.Del.1976):

> The exhaustion doctrine . . . precludes federal review only when a petitioner's state remedy is both "adequate and available". . . . Accordingly, where it is clear from existing decisions of a State Supreme Court that pursuit of a state remedy would be futile, exhaustion is not required. (citations omitted)

11. "In any event, the exhaustion requirement . . . is not jurisdictional and courts may deviate from it in those rare instances where justice so requires." *United States ex rel. Graham v. Mancusi*, 457 F.2d 463, 468 (2d Cir. 1972) (Friendly, J.). In view of the unusual facts of this case, the serious consequences for Victory, and the foregoing exhaustion analysis, the Court alternatively concludes that if there has not been exhaustion, justice requires deviation from that stricture in this case.

This case is stronger than, and therefore distinguishable from, *Kibbe v. Henderson,* 534 F.2d 493 (2d Cir. 1976), *reversed,* —— U.S. ——, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977). There the United States Court of Appeals for the Second Circuit granted habeas corpus to a defendant who was convicted of second degree murder for reckless conduct which caused the victim's death. The petitioner and his co-defendant robbed the murder victim, who was blind drunk, removed his eyeglasses, pulled his pants down around his ankles and left him by the side of an unlighted rural road, in the freezing cold and blowing snow, and drove away. Subsequently, the victim made his way out into the road, where he was run over by a speeding truck which did not attempt to brake before impact. The Second Circuit granted the writ because the trial judge had not instructed the jury on causation. The Supreme Court reversed.

Unlike the instant petition, there may not have been actual jury confusion in *Kibbe,* perhaps because, as the Supreme Court held, the balance of the instructions fully explained the meaning of the causational element. In addition, common sense alone would suggest to a jury that for a defendant to be convicted of murder he must cause the death. Perhaps because causation was an obvious concept, defense counsel did not request an instruction on it, did not object to the lack of instruction, and did not raise the issue in the New York Appellate Division. The issue was raised in the New York Court of Appeals, after being raised for the first time by a dissenting judge in the Appellate Division.

In the instant case, however, it is clear from the jury's questions that there was actual confusion. Moreover, the confusion was on an issue where, as previously suggested, common sense could have led the jury to erroneously conclude that the killing was in furtherance of a subsequently formed intent to escape. Lastly, unlike in *Kibbe,* Victory's counsel repeatedly requested the judge to clarify the element of the time of the escape.

Therefore, the focus of the due process inquiry becomes whether the trial judge fulfilled his duty to clarify the evident confusion on a critical element, or whether he in fact compounded the confusion by the supplemental instruction he gave in response to the jury's inquiry.

The supplemental instruction in effect told the jury that they could find escape based on "flight after the shooting *itself.*" However, the judge did not add that if this was the sole basis for their finding of escape, *i.e.,* if they did not also find an intent to escape prior to or contemporaneous with the shooting, then they must acquit Victory. Rather, the judge merely tagged on a re-reading of the felony murder statute—the "in the course of and in furtherance of such crime or in immediate flight therefrom" language with which he had already charged the jury and which had given rise to the jury's question.

*United States v. Bolden,* 169 U.S.App. D.C. 60, 514 F.2d 1301 (1975), a federal prosecution for felony murder, involved this problem of the time of commission of the underlying felony. As in this case, the judge charged on the elements of felony murder essentially by reading the statute. The Court of Appeals stated that that would not have been error were it not for the fact that "the jury, itself, focused its attention on the timing problem, and indicated to the court that it was confused about exactly this issue." *Id.* at 1308 (footnote omitted). The *Bolden* jury focused on the timing problem by asking a question virtually identical to the question asked by the jury here.[12] The judge addressed the pointed question by re-reading the statute and standard instruction. The Court of Appeals reasoned that "[t]he standard instruction may be sufficient in the first instance on this issue . . . but the jury's request called for further explication of the law on this point." *Id.*

---

**12.** " 'If it is determined that a robbery was in fact committed, does this necessarily imply previous intent to commit a robbery? . . .' " 514 F.2d at 1308 (emphasis in original).

*Bolden* relied on the Supreme Court decision in *Bollenbach v. United States,* 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350 (1946), which also involved a federal prosecution in which the jury at the eleventh hour asked a question about the timing of the defendant's conduct. Justice Frankfurter stated:

> [P]recisely because it was a "last minute instruction" the duty of special care was indicated in replying to a written request for further light on a vital issue by a jury whose foreman reported that they were "hopelessly deadlocked" after they had been out seven hours . . . Particularly in a criminal trial, the judge's last word is apt to be the decisive word. If it is a specific ruling on a vital issue and misleading, the error is not cured by a prior unexceptionable and unilluminating abstract charge. . . . The jury's questions . . . clearly indicated that the jurors were confused . . . . Discharge of the jury's responsibility for drawing appropriate conclusions from the testimony depended on discharge of the judge's responsibility to give the jury the required guidance by a lucid statement of the relevant legal criteria. When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy. . . . A conviction ought not to rest on an equivocal direction to the jury on a basic issue.

*Id.* at 611–13, 66 S.Ct. at 405.

Although this Court has drawn guidance from federal, non-constitutional cases, its conclusion is based on the constitutional standard set forth in *Cupp v. Naughten, supra.* Specifically, the question is whether the failure to adequately charge on the requisite timing of the escape, or otherwise explain the meaning of "in the course of and in furtherance of" ("or in immediate flight therefrom"), "so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten, supra,* 414 U.S. at 147, 94 S.Ct. at 400. This Court holds that it did, for in order to satisfy the constitutional requirements of due process, a criminal conviction must be supported by proof beyond a reasonable doubt of every fact necessary to constitute the crime

charged. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Here, however, the jury's questions, particularly its pointed question as to whether as a matter of law flight after the shooting in and of itself established escape, indicated confusion on the timing of the escape for purposes of felony murder. Because the judge subsequently charged that they could find escape on the sole basis of "flight after the shooting," but did not clearly tell them that if they did so they must acquit Victory of felony murder, "the trial judge's instructions permitted the jury, in its fact-finding process to disregard [Victory's] colorable claim that [there was no preconceived plan of escape] and thus violated [Victory's] constitutional right to have every element of the crime with which he was charged proven beyond a reasonable doubt." *Kibbe v. Henderson, supra,* 534 F.2d at 494. Accordingly, the writ is granted on this claim.

III. *Whether Imposing on the Defendant the Burden of Proof on the Affirmative Defense to Felony Murder Denies Due Process*

This Court gave careful consideration to this weighty constitutional question while the matter was *sub judice.* However, because the writ has been granted on the jury instruction issue, the Court believes that it is compelled to exercise judicial restraint and not reach the serious question of the constitutionality of New York's requirement that a defendant prove by a preponderance of the evidence the affirmative defense to felony murder.

### CONCLUSION

The People are directed to re-try the petitioner within ninety days of the final determination of this matter or at the end of that period unconditionally release petitioner from custody.

This petition poses significant questions of law upon which the Court of Appeals should rule. Accordingly, this Court will issue a Certificate of Probable Cause.

It is so ordered.